EISELE *v.* DETROIT, JACKSON & CHICAGO RAILWAY CO.

RAILROADS—AUTOMOBILES—CROSSING ACCIDENT—NEGLIGENCE—CON-
TRIBUTORY NEGLIGENCE.

> Where the driver of an automobile, knowing that he was
> approaching a dangerous interurban railroad crossing 200
> feet away, drove down grade at such rate of speed that,
> after reaching a point where he could first see an approach-
> ing car, he was unable to stop and avoid a collision, his
> conduct amounted to contributory negligence as a matter
> of law, barring recovery for the death of a passenger rid-
> ing with him in the automobile.

Error to Jackson; Parkinson (James A.), J.   Sub-
mitted January 5, 1923.   (Docket No. 42.)   Decided
October 1, 1923.   Rehearing denied December 20, 1923.

Case by Alice E. Eisele, administratrix of the
estate of George Eisele, deceased, against the Detroit,
Jackson & Chicago Railway Company for the alleged
negligent killing of plaintiff's decedent.   Judgment
for defendant on a directed verdict.   Plaintiff brings
error.   Affirmed.

*Richard Price* and *James J. Noon,* for appellant.
*Cobb, Bisbee & Wilson,* for appellee.

STEERE, J.   Plaintiff brought this action to recover
damages for the death of her husband, George Eisele,
caused by injuries he sustained in a collision between
an automobile in which he was riding and an inter-
urban car of defendant's at a highway crossing just

On attempt to cross in front of observed street car as con-
tributory negligence, see note in L. R. A. 1917C, 692.

For care required of driver of automobile at railroad cross-
ings, see notes in 21 L. R. A. (N. S.) 794; 29 L. R. A. (N. S.)
924; 46 L. R. A. (N. S.) 702.

On duty to look and listen before crossing tracks of an electric
road, see notes in 15 L. R. A. (N. S.) 254; 23 L. R. A. (N.
S.) 1224.

outside the west limits of Grass Lake village, in Jackson county. Trial of the case resulted in a judgment for defendant on directed verdict.

The accident occurred at about 3:30 p. m. of September 30, 1920. The automobile was a Chevrolet sedan weighing about one and one-half tons, owned and driven by Dr. Vaughn, a brother-in-law of deceased who sat beside him on the front seat. Their wives and Mrs. Weber, a neighbor, occupied the back seat. Dr. Vaughn was an experienced driver, familiar with the car he was driving, who stated he drove "365 days out of a year." They were going on an auto drive from Jackson to a farm near Chelsea, but owing to the most direct road being out of repair they took a more circuitous route and a short time before the accident had turned north on a road which crosses defendant's east and west line just west of Grass Lake. Dr. Vaughn testified that although not familiar with this crossing he knew of it, and learned it was a dangerous one before he reached it, for his wife so stated and cautioned him to be careful when they turned north upon that road about 200 feet south of it. He also saw the customary crossing sign ahead, that the road on which he had turned was down grade to the crossing, and the view along the railway to the east of the crossing was obstructed by a hill on his right south of the track. Throwing his car into second gear he drove at a speed of 10 or 12 miles an hour down the grade looking and listening until about 18 feet from the crossing when he first saw the car with which he collided about 70 feet away rapidly approaching from the east and immediately applied his brakes; but realizing he could neither cross nor stop in time to avoid it he turned sharply to the west to go parallel with it and, as he described what followed, "then the front truck just back from the front of the interurban picked my car in the air and

threw it into this telegraph pole." Of the condition of his auto and his experience as a driver he said, "My brakes were in very good order. I have been driving an automobile since 1914. Am thoroughly familiar with the handling of them." On cross-examination he further testified in part:

"*Q.* And you drove \* \* \* approximately 200 feet without any chance to see whether there was a car approaching or not?

"*A.* Yes, sir.

"*Q.* You say you were on the alert and watching for a car and you saw this car as soon as you could see it, did you?

"*A.* Yes, sir.

"*Q.* And you were driving at such a rate of speed when you got into a point where you could see this interurban that you could not stop your auto and avoid the accident?

"*A.* Yes, sir.

"*Q.* You were driving your auto from 10 to 12 miles an hour?

"*A.* Yes, sir. \* \* \* I could see the rails back quite a ways. There was a diamond-shaped crossing sign there. I could see that for a long ways, so I knew where the railroad crossing was. \* \* \*

"*Q.* Your wife told you it was a dangerous crossing?

"*A.* Yes, I knew it was dangerous. \* \* \*

"*Q.* You knew, Dr. Vaughn, that the interurban cars ran at frequent intervals over that road, did you not?

"*A.* Yes, sir.

"*Q.* And you knew also that you might expect a car along there at any time?

"*A.* Yes, I knew they came along there pretty fast. \* \* \*

"*Q.* You know you did run into the side of the interurban car, do you not?

"*A.* Yes, sir. \* \* \* The reason I could not stop . it was because there was a little down grade to the track and it makes it pretty difficult to handle a car there at a time like that."

In other words, the rate of speed at which he ap-

proached this dangerous crossing was such that at the point where he first could and did see the interurban, and might have stopped in safety if going slower, he was unable to avoid running into the side of it.

While the testimony of those occupying the back seat varies somewhat from his as to the rate of speed he was driving and the distance from the track at which the approaching car could be seen, the testimony is undisputed that as they drew nearer it became increasingly apparent to them that they must get close to the track in order to see a car coming from the east; that the driver knew he was approaching a dangerous crossing over which an interurban car running at a high rate of speed might be expected at any time and drove his automobile weighing about one and one-half tons and carrying five adult persons 200 feet down grade towards the track along which he had no opportunity to see an approaching car to the east, at such speed that when in a position near the track to see it, where he might have stopped in safety, he was unable to stop in time to avoid the accident. This was negligence as a matter of law.

The undisputed facts bring this case squarely within the recent case of *Britten* v. *Railway Co., ante,* 91, and the line of decisions there cited, to which may be added *Osborn* v. *Railway Co.,* 115 Mich. 102; *Lau* v. *Railway Co.,* 120 Mich. 115; *Manos* v. *Railway,* 168 Mich. 155; *New York, etc., R. Co.* v. *Maidment,* 168 Fed. 21, 93 C. C. A. 413 (21 L. R. A. [N. S.] 794).

The judgment is affirmed.

WIEST, C. J., and FELLOWS, MCDONALD, CLARK, BIRD, SHARPE, and MOORE, JJ., concurred.